In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-2223

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JESSE A. SMITH,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:08-cr-40067-1 — **Sara Darrow**, *Judge.*

ARGUED OCTOBER 3, 2014 — DECIDED OCTOBER 27, 2014

Before POSNER, ROVNER, and TINDER, *Circuit Judges.*

POSNER, *Circuit Judge.* In 2009 the defendant was sentenced to 24 months in prison, to be followed by 3 years of supervised release, for being a felon in possession of a gun. After being released from prison in 2011, he violated the terms of his supervised release by failing to submit to random drug tests, to attend substance-abuse treatment sessions, and to report to his probation officer. The district judge sentenced the defendant to five months in prison for

these violations, and to an additional 30 months of supervised release. In 2012 the probation officer, while noting that the defendant had generally done well on supervised release, reported that he had twice tested positive for marijuana. The officer suggested, and the judge ordered, modifications in the terms of supervised release. The modifications consisted of requiring the defendant to serve 45 days of home confinement with electronic monitoring. Later, after the defendant had missed several drug tests, the judge ordered him to enroll in a mental health treatment program because he'd told the probation officer that he didn't know why he was taking marijuana but was "weak in spirit, depressed, and suffering anxiety."

To summarize a confusing sequence of events: 1. Smith finishes his five months in prison for violating supervised release and starts his new supervised-release term of 30 months. 2. During the new period he tests positive for marijuana twice and admits to using marijuana regularly—for this he is punished with 45 days of home confinement. 3. He tests positive again right after the 45-day home confinement begins, then tests negative ten times in a row and mental health treatment is added to his conditions of supervised release.

That isn't the end of our story. The following year (2013), the probation officer advised the district judge that the defendant had committed five traffic offenses, all in one day. The judge revoked the defendant's supervised release but offered him a choice between a five-month sentence of imprisonment followed by two or more years of supervised release, or 14 months' imprisonment with no supervised release. He chose the first option, and the judge sentenced him

to five months' imprisonment plus two years of supervised release.

He was released from prison in October 2013 and in April of this year his probation officer advised the district court that the defendant had again violated terms of his supervised release both by continuing to use marijuana and by violating rules of the halfway house where he lived for a time after completion of his prison sentence. Although the recommended custody range for these infractions of the terms of his supervised release was only 5 to 11 months, the government, at the behest of the probation service, asked for 15 months. Defense counsel suggested six months with continued supervision or eight months with no further supervision. He pointed out that the defendant was now 24 years old with three small children, and that employers for whom he had worked during the previous two years had been impressed by his work ethic and would be glad to hire him back after he was released from prison. The district judge (Sara Darrow, not the judge—Joe Billy McDade—who had dealt with the defendant previously), describing the case as a difficult one, added that the defendant had a bank account and actually paid his bills. So he had in her words "great foundations and necessary foundations for you to start being a man." But, she added, "I can't ignore the fact that you were given an opportunity already after you had violated supervised release, and you were given help … . And I can't go back. I can't take steps back. There hasn't been enough … . If you hadn't violated, or if … your conduct on this newest term, or most recent term of supervised release was otherwise exemplary, but for these two positive UAs [urinalysis tests for drugs], I might be willing to give you a little bit more benefit of the doubt … . I cannot ignore the fact that

you were given a huge break last time around by Judge McDade, and you let him and the Court down. I can't go back and give you less than the option than [*sic*] you had back then. I think that would denigrate the seriousness of these violations, and of the chance you were given. It would promote disrespect for the law, and it would not be an adequate deterrent from [*sic*] your future conduct." She sentenced him to 15 months in prison but no more supervised release.

The defendant argues that Judge Darrow did not exercise discretion in sentencing him, but rather was "constrained by a sentence suggested by a different district court judge at a previous revocation proceeding," and that "this predetermination of a sentence deprived [the defendant] of his right to Due Process[;] and the district court's failure to exercise discretion is reversible error."

We've said that "a judge can't be allowed, when imposing conditions of probation (or of supervised release), to commit himself to a specified penalty should there be a violation or violations. The number and gravity of any violations that are committed would be germane to any rational judgment on whether to revoke probation and, if it is revoked, what punishment to impose for the violations. Any significant changes in the defendant's situation, such as mental deterioration, would have to be considered as well. We don't think a judge can be permitted to disable himself from considering such factors by committing himself in advance to a specified for any violation of probation, committed at any time, under any circumstances." *United States v. Tatum*, 760 F.3d 696, 697 (7th Cir. 2014). And by the same token we don't think a successor judge can be permitted to

commit himself in advance to imposing the same sanction imposed by his predecessor.

But that's not what Judge Darrow did. The fact that the defendant's supervised release had twice been revoked was something the judge was free, maybe required, to consider in deciding what sentence to impose for a third set of violations. That third set hadn't been very serious, judging from the recommended sentencing range of 7 to 11 months. But the judge was entitled to go above it in light of the defendant's earlier violations of supervised release. And she went only 4 months above the range. She could have sentenced him to 24 months instead of 15.

That doesn't mean that we have to be happy with the sentence. The defendant's problem is marijuana (he admits it's a problem), and quite apart from the issue, which is none of our business, whether personal use of marijuana should be illegal, we have our doubts that imprisonment is an appropriate treatment for a marijuana habit. (There is no suggestion that the defendant deals, or has ever dealt, in marijuana or any other illegal drug; he's just a consumer.) The 29 months that he served in prison beginning in 2009 did not break him of his habit; what is the basis for thinking that 14 more months in prison will? Maybe with a job and a family and greater maturity he'll outgrow it, or reduce his consumption to a level at which it has no significant behavioral or psychological ill effects. The fact that he's impressed his employers suggests that he can function even with the habit, in which event it might have been better had the judge not imposed a prison sentence but instead had ordered a stricter regimen of treatment for the defendant's drug habit. Potential employers are unlikely to hold a job open for 15 months,

and there may be no vacancy for the defendant to fill when he's released. Nevertheless we can't say that the judge abused her discretion in sentencing him as she did.

We're mindful of the defendant's serious criminal record as a youth, part of an unfortunate personal history that includes his father's being imprisoned for murder and his mother's use of crack cocaine. By the time the defendant first appeared before Judge McDade in 2009, age 18, he had a criminal history that included battery, burglary, and fighting with police officers. His gun offense was committed fewer than two months after his felony burglary conviction. Regarding the gun offense, Smith admitted that he had been paid by a crack dealer to store the (loaded) gun. He also admitted having allowed the crack dealer to use his mother's house for the sale of crack. But the defendant's criminal career, except for continued use of marijuana, ended five years ago—which may be why Judge Darrow, in her sentencing statement, mentioned only his continued use of marijuana.

She may, however, at least have alluded to a serious consequence, or serious consequences, of that use. One possible allusion was to the five traffic offenses. She may have had those in mind when she suggested that, had the defendant's conduct other than in testing positive twice for marijuana been exemplary, she might have given him a lighter sentence (maybe no jail time). The traffic offenses—three of which at least were serious: driving under the influence, leaving the scene of an accident, and resisting arrest—appear to have been the result of the defendant's being high on marijuana. And while jail time is unlikely to cure a drug habit, as distinct from interrupting it, it may deter a defendant from us-

ing drugs at times, such as before driving, that create a risk of traffic violations potentially of criminal magnitude.

Alternatively she may have been alluding to the violations that the defendant committed after the third revocation of supervised release—testing positive for marijuana twice and violating rules of the halfway house. For she referred to his "conduct on this nearest term" of supervised release. She may have decided that he was an incorrigible supervised-release violator who had to be taught a lesson by a stiff prison sentence. And that was her prerogative, whether as an original matter we might think it unduly harsh and likely to be ineffectual in breaking the defendant's marijuana habit or otherwise altering his behavior.

There are two other issues—besides whether the judge was (we think she was not) basing the 15-month prison sentence that she meted out to the defendant on a belief that she could not impose a lesser sanction for his violation of supervised release than Judge McDade had done—lurking in this case. The first goes to the heart of supervised release. Before the Sentencing Reform Act of 1984 replaced parole with supervised release, the Parole Commission determined whether and when a prisoner would be released before the completion of the term to which he'd been sentenced. In making that determination the Commission drew on observations by prison personnel of a prisoner's behavior in prison and what that behavior augured for the likelihood that he would go straight upon release. Supervised release puts the judge in the awkward position of trying to predict the defendant's post-release conduct without the benefit of any observation of his conduct in prison (since he may be free on bail until he's sentenced, and in any event will not have begun serving

his sentence) and any other changes that may have occurred since he was sentenced. For the terms of supervised release are set at sentencing, though they can be modified later. The tendency in sentencing, given the inability of the sentencing judge to predict the future, is to err on the side of imposing a scattershot of terms of supervised release—20 in this case, some duplicative, some that can't be complied with (in this case, for example, that the defendant "shall not associate with any person convicted of a felony"—how will the defendant know whether a person he associates with has a felony conviction?—or that he "shall obtain a GED within the first 12 months of supervision" if he doesn't have one already; our defendant tried, but fell just short of succeeding).

The most serious problem with the blizzard of supervised-release terms is that it conflates criminality with disobedience. It's not as if all terms of supervised release address crimes. It's not a crime not to get a GED, or to associate with a felon. It remains a crime in most states to possess marijuana even in small (i.e., personal-use) quantities, though a number of states now permit its use for medical purposes. Possession of marijuana is also a federal crime, but federal prosecution for possession of personal-use rather than dealer quantities is rare. Legal change and prosecutorial discretion to one side, public tolerance for marijuana has grown to the point of making simple possession of it a radically underenforced crime. It's been estimated that 38 percent of American adults *admit* having tried marijuana at one time or another, Gallup, "In U.S., 38% Have Tried Marijuana, Little Changed Since '80s," Aug. 2, 2013, www.gallup.com/poll/163835/tried-marijuana-little-changed-80s.aspx (visited Oct. 12, 2013), and the percentage that have tried it (whether or not willing to admit having done so) must be higher. The de-

fendant disobeyed the terms of his supervised release repeatedly, but his current profile is not that of a dangerous criminal, and the utility of his continued imprisonment is difficult to see.

Nevertheless for the reasons explained earlier we would have no choice but to affirm the district court's judgment, though reluctantly, were it not for a document—surprisingly mentioned by neither party—that we have discovered in the record. The document is entitled "Violation Memorandum" (the reference is to the violation of supervised release by the defendant) and was prepared by the probation service. It is dated February 18, 2011, shortly before the defendant was sentenced by Judge McDade for his first violation of supervised release. The document states that the assistant U.S. attorney handling the revocation case was Sara Darrow. When the report was prepared, she had already been nominated to be a district judge, but she was not confirmed until August 2, 2011, almost six months later. The hearing at which Judge Darrow sentenced the defendant was held on May 29 of this year. We don't know the precise extent of her involvement in the 2011 revocation of supervised release. The docket sheet reveals that she had appeared before the judge on January 7, 2011, for a hearing on the defendant's first violation of supervised release. We don't know how extensive her participation in that hearing was. Even if it was quite limited, anyone who plays a prosecutorial role in a case might be considered ineligible to sentence the defendant in the same case, even years later.

We also do not know whether when assigned to the present case in succession to Judge McDade on April 1, of this year, or at the sentencing hearing in May, Judge Darrow had

any conscious or unconscious memory of having been involved in the earlier revocation. For that matter, we don't know whether the Violation Memorandum and docket entry are accurate in associating her with the case. Still, on the bare record, we cannot exclude the possibility that the sentence was influenced by a recollection by the judge, perhaps prompted by the defendant's supervision history prepared by the probation service, that she had participated in the defendant's first revocation hearing, a hearing at which Judge McDade had imposed a relatively mild sentence—five months in prison plus 14 months of supervised release—to no avail.

Section 455(b)(3) of the Judicial Code provides that a judge "shall … disqualify himself ... where he has served in governmental employment and in such capacity participated as counsel, advisor or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy." "Proceeding" is defined to include "pretrial, trial, appellate review, or other stages of litigation." *United States v. Ruzzano*, 247 F.3d 688, 695 (7th Cir. 2011), holds that we can correct a clear violation of section 455(b)(3) on appeal even if the defendant failed to invoke the statute in the district court.

The present record is inadequate to enable us to determine whether there was such a violation. We have therefore decided to suspend our decision of the appeal pending receipt from the parties of supplemental briefs addressing the applicability of section 455(b)(3) to Judge Darrow's participation in this litigation. We ask that the briefs be submitted within 30 days of the date of this opinion.